**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF NORTH DAKOTA, NORTH DAKOTA DEPARTMENT OF ENVIRONMENTAL QUALITY and NORTH DAKOTA GAME AND FISH DEPARTMENT, <br><br> Plaintiffs, <br><br> v. <br><br> SUMMIT MIDSTREAM PARTNERS, LLC, and MEADOWLARK MIDSTREAM COMPANY, LLC, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No._____ |

## COMPLAINT

The United States of America ("United States"), by authority of the Attorney General of the United States and on behalf of the United States Environmental Protection Agency ("EPA") and the United States Department of the Interior ("DOI"); and the State of North Dakota (the "State"), on behalf of the North Dakota Department of Environmental Quality ("NDDEQ") and the North Dakota Game and Fish Department ("NDGF"), file this Complaint and allege as follows:

## NATURE OF THE ACTION

1.     This is a civil action asserting claims against Defendants Summit Midstream Partners, LLC and Meadowlark Midstream Company, LLC (together, "Defendants") relating to their discharge of produced water, including crude oil, from the Marmon Water Gathering System into and upon navigable waters and adjoining shorelines of the United States and waters of the State of North Dakota. Defendants reported the quantity of discharge to be 70,000 barrels of produced water. Evidence suggests the discharge exceeded 700,000 barrels of produced water.

1

2.      Plaintiffs seek: (a) injunctive relief and civil penalties pursuant to Sections 309 and 311 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319 and 1321, and N.D.C.C. §§ 61-28-04(22) and 61-28-08; and (b) natural resource damages under Section 311(f)(4) of the CWA, 33 U.S.C. § 1321(f)(4), and N.D.C.C. § 61-28-04(24).

**JURISDICTION, AUTHORITY, AND VENUE**

3.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 309(b), 311(b)(7)(E), and 311(n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E) and 1321(n), and 28 U.S.C. §§ 1331, 1345, and 1355; and over claims asserted by NDDEQ pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction).

4.      Venue is proper in the District of North Dakota pursuant to Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E), and 28 U.S.C. §§ 1391 and 1395, because it is the judicial district in which Defendants are doing business and in which the claims alleged in the Complaint occurred.

5.      Authority to bring the United States' claims is vested in the United States Department of Justice by, *inter alia*, Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

6.      Authority to bring the State's claims is vested in NDDEQ and NDGF by, *inter alia*, N.D.C.C. §§ 61-28-04, and 61-28-08. NDDEQ came into existence on April 29, 2019, and became the State agency responsible for the administration and enforcement of the environmental protection programs, laws, and rules previously administered and enforced by the North Dakota Department of Health's Environmental Health Section. Pursuant to 2017 N.D. Sess. Laws ch. 199, § 1, the North Dakota Department of Health's interest in the causes of action

alleged in the Complaint have been assigned to the NDDEQ. For purpose of this Complaint, the term "NDDEQ" includes the North Dakota Department of Health for activities occurring prior to April 29, 2019 and for statutes and rules in effect prior to April 29, 2019. Due to the transition, the rules in N.D. Admin. Code art. 33-16 have moved to 33.1-16. Because the violations began prior to April 29, 2019, NDDEQ references N.D. Admin. Code art. 33-16 in this Complaint, but for activities ongoing after the transition, NDDEQ also alleges violations of the nearly identical rules in N.D. Admin. Code art. 33.1-16.

7.      Notice of commencement of this action has been given to North Dakota in accordance with Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANTS

8.      Summit Midstream Partners, LP ("SMLP") is a publicly traded master limited partnership that, together with its affiliates and subsidiaries, owns, operates, and develops infrastructure assets to provide fee-based natural gas, crude oil, and produced water gathering services to oil and gas exploration companies. SMLP and its affiliates and subsidiaries operate in multiple resource basins, including the Bakken Shale Basin in northwestern North Dakota.

9.      Defendant Summit Midstream Partners, LLC ("Summit Midstream" or "Summit") is a subsidiary of SMLP. Summit is a privately held Delaware limited liability company with its principal place of business at 910 Louisiana Street, Suite 4200, Houston, TX 77002. Summit Midstream Partners, LLC is also referred to as "Summit Investments." At the time of the discharge at issue in this Complaint, Summit provided all operating services for the midstream facilities under the SMLP umbrella.

10.      Defendant Meadowlark Midstream Company, LLC ("Meadowlark") is a

3

Delaware limited liability company with its principal place of business at 999 18th Street, Suite 3400 South, Denver, CO 80202-2434. Meadowlark was an indirect, wholly owned subsidiary of Summit at the time of the discharge. Meadowlark owns crude oil, natural gas, and water gathering systems in the Bakken Shale Basin, including the Marmon Water Gathering System at issue in this Complaint. At the time of the discharge, Summit employees performed services necessary to conduct Meadowlark's operations. Summit employees were also responsible for environmental compliance at Meadowlark's operations, including the Marmon Water Gathering System.

11.     Summit and Meadowlark are each a "person" within the meaning of Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5), and N.D.C.C. § 61-28-02(5).

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

### Clean Water Act Injunctive Relief

12.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" except, *inter alia*, in compliance with a national pollutant discharge elimination system ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

13.     "Discharge of a pollutant" is defined by Section 502(12) of the CWA to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

14.     "Person" is defined by Section 502(5) of the CWA to include "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

15.     "Pollutant" is defined by Section 502(6) of the CWA to include "solid waste . . . chemical wastes, biological materials . . . and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

16.     "Point source" is defined by Section 502(14) of the CWA as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

17.     "Navigable waters" is defined by Section 502(7) to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

18.     Section 309(b) of the CWA authorizes the United States to "commence a civil action for appropriate relief, including a permanent or temporary injunction," for violations of Section 301. 33 U.S.C. § 1319(b).

**Clean Water Act Civil Penalties**

19.     Section 311(b) of the CWA prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States or adjoining shorelines in such quantities as may be harmful to the public health or welfare or the environment of the United States. 33 U.S.C. § 1321(b)(3) & (b)(4).

20.     "Discharge" is defined by Section 311(a)(2) of the CWA to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping." 33 U.S.C. § 1321(a)(2).

21.     "Oil" is defined by Section 311(a) of the CWA as "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes

other than dredged spoil." 33 U.S.C. § 1321(a)(1).

22.     EPA, acting through its delegated authority, has determined by regulation that discharges of oil in such quantities as may be harmful to the public health or welfare or environment of the United States include discharges of oil that "(a) [v]iolate applicable water quality standards; or (b) [c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3(b).

23.     "Hazardous Substance" is defined by Section 311(a)(14) as "any substance designated pursuant to subsection (b)(2) of this section." 33 U.S.C. § 1321(a)(14).

24.     EPA, acting through its delegated authority, has promulgated a table listing elements and compounds designated as hazardous substances pursuant to Section 311(b)(2)(A) of the CWA. 40 C.F.R. § 116.4.

25.     Section 311(b)(7) of the CWA provides that any "person who is the owner, operator, or person in charge of any . . . onshore facility . . . from which oil or a hazardous substance is discharged" in violation of Section 311(b)(3) shall be subject to a civil penalty. 33 U.S.C. § 1321(b)(7).

26.     "Owner or Operator" is defined by Section 311(a)(6) of the CWA to mean, in the case of an onshore facility, "any person owning or operating such onshore facility." 33 U.S.C. § 1321(a)(6).

27.     "Person" is defined by Section 311(a) of the CWA to include "an individual, firm, corporation, association, and a partnership." 33 U.S.C. § 1321(a)(7).

28.     "Onshore facility" is defined by Section 311(a) of the CWA to include "any

facility . . . of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 1321(a)(10).

29.      "Navigable waters" is defined by Section 502(7) to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

30.      Pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), and EPA's 2013 and 2016 Civil Monetary Penalty Inflation Adjustment Rules, 78 Fed. Reg. 66643-01 (Nov. 6, 2013), and 81 Fed. Reg. 43091-96 (July 1, 2016), codified at 40 C.F.R. § 19.4, each violation of Section 311(b)(3) occurring after December 6, 2013 and on or before November 2, 2015 is subject to a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

31.      Pursuant to Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), and EPA's 2013 and 2016 Civil Monetary Penalty Inflation Adjustment Rules, 78 Fed. Reg. 66643-01 (Nov. 6, 2013), and 81 Fed. Reg. 43091-96 (July 1, 2016), codified at 40 C.F.R. § 19.4, where the violation of Section 311(b)(3) occurring after December 6, 2013 and prior to November 2, 2015 was the result of gross negligence or willful misconduct, the owner, operator, or person in charge is subject to a civil penalty of up to $5,300 per barrel of oil discharged.

**Natural Resource Damages Under the Clean Water Act**

32.      Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the "discharge of oil or hazardous substances . . . into or upon the navigable waters of the United States [and] adjoining shorelines . . . , or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States, in such quantities as may be harmful as determined by the President . . . ."

33.     Section 311(f)(2) of the CWA, 33 U.S.C. § 1321(f)(2), provides, in relevant part, that subject only to certain specified defenses, the "owner or operator of any such [onshore] facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance . . . ."

34.     Section 311(f)(4) of the CWA, 33 U.S.C. § 1321(f)(4), provides that the "costs of removal of oil or a hazardous substance for which the owner or operator of a vessel or onshore or offshore facility is liable under subsection (f) of this section shall include any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance in violation of subsection (b) of this section."

35.     The CWA authorizes state and federal officials with delegated authority to "act on behalf of the public as a trustee of the natural resources to recover for the costs of replacing or restoring such resources." 33 U.S.C. § 1321(f)(5); *see also* 40 C.F.R. §§ 300.600, 300.605.

36.     Sums recovered by the federal or state trustee "shall be used to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government, or the State government." 33 U.S.C. § 1321(f)(5).

37.     "Natural Resources" is defined by applicable regulations to include "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States . . . [and] any State or local government . . . ." 43 C.F.R. § 11.14(z).

## STATE STATUTORY AND REGULATORY REQUIREMENTS

### Permit Required for Discharges

38.     North Dakota Century Code § 61-28-06(2)-(3) makes it unlawful for a person to discharge any wastes, except as in compliance with a valid permit issued by NDDEQ.

39.     North Dakota Administrative Code § 33-16-01-02 provides that a person must file a NPDES application before discharging "any waste through a point source into a surface water." A NPDES permit issued by NDDEQ is referred to as a North Dakota pollutant discharge elimination system ("NDPES") permit.

### Pollution and Degradation of Water Quality Prohibited

40.     North Dakota Century Code § 61-28-06(1)(a) makes it unlawful for a person "[t]o cause pollution of any waters of the state, or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state."

41.     North Dakota Century Code § 61-28-06(1)(b) makes it unlawful for a person "[t]o discharge any wastes into any waters of the state, or to otherwise cause pollution, which reduces the quality of such waters below the water quality standards established therefor by the department."

42.     North Dakota Administrative Code § 33-16-02.1-11(2) makes it unlawful to discharge into the waters of the state "untreated industrial wastes or other wastes which contain substances . . . which may endanger public health or degrade the water quality of water usage."

43.     North Dakota Administrative Code § 33-16-02.1-09 provides for the classification of the state's surface water and contains the standards with which the various classifications of surface water must comply, including physical and chemical criteria. "[S]treams are classified as

9

the class of water quality which is to be maintained in the specified stream." Appendix I, N.D. Admin. Code Ch. 33-16-02.1. As relevant here, the numeric maximum chloride standard for Class II and Class III streams is 250 mg/l (30-day arithmetic average). N.D. Admin. Code § 33-16-02.1-09(3)(c)-(d).

44.     North Dakota Administrative Code § 33-16-02.1-08(1) contains the state's narrative water quality standards, which, as relevant here:

a.     Require that all waters of the state be free from: floating oil or scum attributable to industrial or other discharges in amounts that are "unsightly or deleterious"; substances attributable to industrial or other discharges that are in concentrations or combinations "toxic or harmful to humans, animals, plants, or resident aquatic biota"; and "oil or grease residue attributable to wastewater, which causes a visible film or sheen upon the waters or any discoloration of the surface of adjoining shoreline or causes a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines or prevents classified uses of such waters." N.D. Admin. Code § 33-16-02.1-08(1)(a).

b.     Prohibit the discharge of pollutants, which "[c]ause a public health hazard or injury to environmental resources; [i]mpair existing or reasonable beneficial uses of the receiving waters; or [d]irectly or indirectly cause concentrations of pollutants to exceed applicable standards of the receiving waters." N.D. Admin. Code § 33-16-02.1-08(1)(e).

**Reporting Requirements**

45.     North Dakota Administrative Code § 33-16-02.1-11(4) requires an "owner, operator, or person responsible" to "immediately" report to NDDEQ "[a]ny spill or discharge of waste which causes or is likely to cause pollution of waters of the state" and "provide all relevant

information about the spill."

46.    Upon receipt of notification of a spill or discharge, NDDEQ "may require the owner or operator to: [t]ake immediate remedial measures; [d]etermine the extent of pollution to waters of the state; [p]rovide alternate water sources to water users impacted by the spill or accidental discharge; or [a]ny other actions necessary to comply with this chapter." N.D. Admin. Code § 33-16-02.1-11(4).

## Definitions

47.    The term "person" is defined as "any corporation, limited liability company, individual, partnership, association, or other public or private entity, including any state or federal agency or entity responsible for managing a state or federal facility, and includes any officer or governing or managing body of any such entity." N.D.C.C. § 61-28-02(5).

48.    The term "discharge" is defined as "the addition of any waste to state waters from any point source." N.D.C.C. § 61-28-02(3).

49.    The term "point source" is defined as "any discernible, confined, and discrete conveyance, including any pipe, ditch, channel, tunnel, conduit, well, discrete fissure . . . from which wastes are or may be discharged." N.D.C.C. § 61-28-02(6).

50.    The term "pollution" is defined as "the manmade or man-induced alteration of the physical, chemical, biological, or radiological integrity of any waters of the state." N.D.C.C. §61-28-02(7).

51.    The term "wastes" is defined as "all substances which cause or tend to cause pollution of any waters of the state . . . ." N.D.C.C. § 61-28-02(14).

52.    The term "waters of the state" is defined as "all waters within the jurisdiction of

this state including all streams, lakes, ponds, impounding reservoirs, marshes, watercourses, waterways, and all other bodies or accumulations of water on or under the surface of the earth, natural or artificial, public or private, situated wholly or partly within or bordering upon the state, except those private waters that do not combine or effect a junction with natural surface or underground waters just defined." N.D.C.C. § 61-28-02(15).

## Penalty

53.     North Dakota Century Code § 61-28-08(4) provides that a person who violates N.D.C.C. ch. 61-28 or a "rule, order, limitation, or other applicable requirement implementing this chapter, is subject to a civil penalty not to exceed twelve thousand five hundred dollars per day per violation."

## Injunctive Relief

54.     North Dakota Century Code § 61-28-08(5) authorizes NDDEQ to "maintain an action in the name of the state against any person to enjoin any threatened or continuing violation of any provision of this chapter or any permit condition, rule, order, limitation, or other applicable requirement implementing this chapter."

55.     Any person who violates an order for injunctive relief is subject to sanctions, including a penalty of up to "twenty-five thousand dollars per day per violation." N.D.C.C. § 61-28-08(5).

## Damages

56.     North Dakota Century Code § 61-28-04(24) provides that NDDEQ "with the cooperation of other departments, may maintain an action for damages in the name of the state for violations of the provisions of this chapter."

12

## GENERAL ALLEGATIONS

### Background

57.     This complaint involves the largest documented spill of produced water in North Dakota state history. The spill originated from a pipeline owned and operated by Defendants in Marmon, North Dakota into Blacktail Creek, a tributary of the Missouri River (the "Blacktail Creek Discharge"). The Blacktail Creek Discharge contaminated Blacktail Creek, its sediments, adjoining shorelines, and downstream waterways.

58.     Produced water is a waste byproduct of the crude oil extraction process. Produced water is present in the subsurface reservoir together with crude oil and is produced to the surface together with the crude oil during its extraction. Produced water typically contains water, crude oil, grease, dissolved salts, organic compounds, inorganic compounds, and other contaminants that have transferred into the water from the surrounding environment.

59.     The pipeline involved in the Blacktail Creek Discharge was part of the Marmon Water Gathering System – a produced water gathering system constructed by Defendants to carry produced water generated by a third party oil and gas producer, Halcon Resources Corporation and/or its affiliate HRC Operation, LLC ("Halcon"), from multiple well pads to an underground injection site owned and operated by Halcon.

60.     Meadowlark owned the Marmon Water Gathering System at the time of the Discharge, and continues to own the system as of the filing of this Complaint.

61.     At all times relevant to the Blacktail Creek Discharge, and up until May 2020, the Marmon Water Gathering System was operated by Summit's employees.

62.     Throughout the construction and operation of the Marmon Water Gathering

System before and during the Blacktail Discharge, and throughout the response to the Blacktail Creek Discharge, employees and officers involved in design decisions, funding approvals, inspections, pipeline testing, and communications with state and federal regulators identified their employer interchangeably as "Meadowlark," "Summit Midstream," "Summit," or "Summit Midstream Partners."

63.     At all times relevant to the Blacktail Creek Discharge, Summit managed, directed, and controlled decisions relating to environmental compliance for the Marmon Water Gathering System, including control of design and funding decisions on leak detection and pipeline metering, reporting itself as the "responsible party" when reporting the Blacktail Creek Discharge to regulators, overseeing pipeline inspections, employing contractors to assess and respond to the Blacktail Creek Discharge, and communicating directly with state and federal regulators on Blacktail Creek Discharge response efforts.

### The Marmon Water Gathering System

64.     At the time of the Blacktail Creek Discharge, the Marmon Water Gathering System consisted of a series of interconnected pipelines designed to service approximately 37 wells owned and operated by Halcon in Williams County, North Dakota. At each well pad, storage tanks with produced water, which are operated by Halcon, are connected to the pipeline by Lease Automatic Custody Transfer units ("LACT" units), which were operated by Summit. The produced water then flows through pipelines in the Marmon Water Gathering System, ultimately discharging into one of two underground injection wells (also known as "salt water disposal" or "SWD" wells) named Petrohunt #1 and Petrohunt #2. The site at which the Petrohunt #1 and Petrohunt #2 injection wells are located is owned and operated by Halcon, and

is also referred to as the "Marmon SWD." A schematic of the Marmon Water Gathering System is attached as Exhibit A to this Complaint.

65.     In this Complaint, "Marmon Water Gathering System" refers to the pipelines, LACT units, pumps, and associated equipment owned and operated by Defendants to deliver produced water from the Halcon-owned well pads to the Halcon-owned Marmon SWD. The "Marmon Pipeline" refers to the set of interconnected pipelines within the Marmon Water Gathering System.

66.     The total capacity of the Marmon Pipeline in the Marmon Water Gathering System is approximately 8,000 barrels of produced water per day.

67.     The Marmon Water Gathering System is also referred to as part of the "Blacktail System," which is also owned and/or operated by Defendants.

**Construction and Testing of the System: October 2013 to October 2014**

68.     Defendants began installing pipeline as part of the Marmon Water Gathering System in approximately October 2013.

69.     Defendants selected Fiberspar LinePipe for the pipeline material in the Marmon Water Gathering System. Fiberspar LinePipe is manufactured using an inner thermoplastic pressure barrier designed to resist corrosion, which is reinforced with glass fibers embedded in an epoxy matrix and an outer thermoplastic layer. The pipelines installed as part of the Marmon Water Gathering System consist of 4.5 inch diameter and 6 inch diameter segments.

70.     Defendants began connecting the Marmon Pipeline to LACT units at Halcon well pads on or about March 2014.

71.     From approximately May 29, 2014 to October 7, 2014, Defendants conducted a series of "pressure tests" on the entire Marmon Pipeline. Pressure tests are intended to ensure that the material has not been damaged in installation and to otherwise confirm the pipe's integrity.

72.     The Fiberspar pipe used in the Marmon Water Gathering System was rated at 750 pounds per square inch ("psi"). According to Fiberspar specifications, pressure tests should be conducted at 1.2 to 1.5 times the rated operating pressure of the system, i.e., 900 to 1,125 psi.

73.     During the series of pressure tests on the Marmon Pipeline between May 29, 2014 and October 7, 2014, Defendants conducted pressure tests on the Fiberspar pipe used in the Marmon Pipeline at no more than 750 psi.

74.     Inspectors hired by the Defendants kept daily records of the pipeline installation and testing process in documents called "Inspectors Daily Reports." From approximately June 13, 2014 to July 17, 2014, Inspectors Daily Reports identified "leaks" and "blowouts" in the Marmon Pipeline that had to be repaired. On several occasions, the leaks or blowouts were in the Fiberspar pipe and not fittings. The Inspectors Daily Reports attributed some leaks and blowouts to "faulty pipe" or "faults in the pipe" and others to rocks on or against the pipe that had damaged the pipe during backfill as part of the installation process.

**System Operations Before Reporting the Blacktail Creek Discharge:
June 2014 to January 6, 2015**

75.     On or about June 2014, Defendants began accepting produced water into the Marmon Water Gathering System for disposal at the Marmon SWD.

76.     Defendants operated a meter at each LACT unit in the Marmon Water Gathering System to measure the amount of produced water accepted into the system, in order to bill

Halcon for the service. In addition, Halcon installed meters at the Petrohunt #1 and Petrohunt #2 injection wells to measure the amount of produced water injected into the well pursuant to N.D. Admin. Code § 43-02-05-12 and condition #7 of underground injection control ("UIC") permits W0238S0701D and W0237S0700D.

77.    At the time Defendants began accepting produced water into the Marmon Water Gathering System and continuing until December 24, 2014, neither Defendants nor Halcon had meters at the inlet point where the produced water was transferred from the Marmon Pipeline to holding tanks operated by Halcon and its contractor at the Marmon SWD.

78.    At the time Defendants began accepting produced water into the Marmon Water Gathering System and continuing until December 24, 2014, Defendants did not have any operational equipment in place specifically designed to detect leaks in the Marmon Pipeline.

79.    At the time Defendants began accepting produced water into the Marmon Water Gathering System and continuing until December 24, 2014, Defendants did not have any operational equipment in place specifically designed to conduct line balancing on the Marmon Pipeline.

80.    Line balancing is the practice of measuring the amount of liquid entering and exiting a pipeline and comparing those values to detect abnormalities and leaks. Summit's own employee acknowledged the risk of operating the Marmon Pipeline without line balancing: "without it we really don't have a good leak detection system with no checks and balances."

81.    No later than July 13, 2014, Defendants began contemplating adding meters on the Marmon Pipeline at the inlet to the Marmon SWD to monitor for potential imbalances in the line that might indicate a leak. On July 23, 2014, Defendants received a proposal for installation

of Rosemount magnetic flow meters at the Marmon SWD (the "Rosemount Meters"). Defendants placed an order for the Rosemount Meters on July 24, 2014.

82.     Defendants received the Rosemount Meters on or about August 14, 2014. Defendants installed the Rosemount Meters at the inlet to the Marmon SWD on or about September 22, 2014, but did not run electricity to the meters at that point to make them operational.

83.     Meanwhile, on August 17, 2014, pressure on the Marmon Pipeline dropped precipitously, from approximately 500 psi to less than 100 psi at the location closest to the rupture. Defendants collected this pressure data through pressure gauges on the Marmon Pipeline. Low pipeline pressure can indicate a leak in the pipeline, which cannot maintain the same pressure with a lower flow.

84.     Starting no later than August 25, 2014, Defendants' internal communications identified low pressures on the Marmon Pipeline. An August 25, 2014, email indicated that pipeline "pressures have dropped dramatically." Emails on September 9, 2014, stated that "line pressures have significantly decreased" and referred to "pressure problems" on the pipeline.

85.     An aerial photo taken on September 7, 2014, indicates that the Blacktail Creek Discharge was well underway at that point and had reached Blacktail Creek, with visible impacts on the ground and the waterway. Additional aerial photos from September 16, 2014, October 3, 2014, October 25, 2014, November 2, 2014, and December 10, 2014, indicate that the Blacktail Creek Discharge continued during this time frame, with visible impacts on the ground and the waterway.

86.     On October 14, 2014, Summit's North Dakota Construction Manager sent an

email to Summit's Facilities Engineer, Vice President of Engineering and Construction, Oil Pipeline Manager, and the Electric Instrument and Control Engineer, raising a concern that the Rosemount Meters had been installed but still were not providing readouts of the daily production at the SWD. In particular, he stated that "[w]e have such extreme low pressure on the pipeline since Halcon fixed their disposal that I am not too sure we may not have a problem . . . . The ops guys have driven the pipelines looking to see if there are leaks and I currently have people driving the lines as well looking for problems." In his response, the Facilities Engineer stated "Not good. We may want to consider shutting it down."

87.     Defendants did not shut the Marmon Water Gathering System pipeline down at the time of these communications or at any point prior to January 6, 2015.

88.     At the end of November 2014, Halcon raised concerns with Summit about the volume discrepancies between the LACT metering data (i.e., produced water that went into the pipeline) and the injection well metering data. Halcon continued to flag unresolved volume discrepancies for Defendants on December 3, 10, and 16, 2014. Halcon's December 10 notice, for example, indicated a discrepancy of 4,900 barrels per day, which Halcon attributed to "either a leak or water . . . being diverted/transported to an alternative route." At that time, Defendants still had not made the Rosemount Meters operational.

89.     On December 17, 2014, Defendants installed the electrical wiring necessary to operate the Rosemount Meters at the Marmon SWD and on December 24, 2014, Defendants put the Rosemount Meters into service. According to a Summit employee's notes on the incident, the Rosemount Meters allowed Defendants to monitor both the inlet and outlet to the Marmon Water Gathering System pipeline to "confirm the liquid loss that we have suspected but been unable to

identify."

90.     On January 6, 2015, Summit's Lead Field Pipeline Operator walked the line to look for leaks. On January 7, 2015, Summit Midstream reported a discharge of unknown quantity from the Marmon Water Gathering System to the North Dakota Industrial Commission ("NDIC") (Incident # 2015017160242), and to the National Response Center ("NRC") (Incident # 1105105).

## Blacktail Creek Discharge

91.     The Blacktail Creek Discharge reported on January 7, 2015, originated from a rupture in the Marmon Pipeline approximately 1.2 miles northeast of Marmon, North Dakota, in an open field near the State 157-100-29A-31-1H and Moline 157-100-20D-17-2H well pads and approximately 178 feet from Blacktail Creek.

92.     Produced water discharged from the pipeline rupture into area groundwater. Produced water also travelled to Blacktail Creek through a ditch or other naturally occurring pathway further channelized by the volume and duration of flow.

93.     The Blacktail Creek Discharge contaminated groundwater and Blacktail Creek with produced water, including crude oil, chloride, sodium, ammonia, aluminum, arsenic, boron, copper, nickel, selenium, zinc, barium, benzene, and thallium, among other contaminants.

94.     Though the Blacktail Creek Discharge was first reported by Summit on January 7, 2015, metering data indicates that the Blacktail Creek Discharge began as early as August 2014, and continued through January 7, 2015, when Defendants shut down the Marmon Pipeline so that produced water could no longer flow to the leak location. Contaminated groundwater from the Blacktail Creek Discharge continued to discharge to Blacktail Creek throughout 2016.

95.    On October 20, 2014, water quality data collected at the USGS gauging station 06331000 on the Little Muddy River (also known as the Little Muddy Creek), approximately 4 miles downstream of its confluence with Blacktail Creek, shows the highest chloride and boron concentrations ever recorded at that station during its 42-year period of record. Further isotope analysis of that sample indicates it contained produced water.

96.    Also in October 2014, a landowner downstream from the Spill location noted that the "water in the creek . . . was rusty [and] slimy." The landowner noticed that the "creek was flowing all winter," which was unusual in the freezing temperatures. He stated that "the water in the creek . . . remained flowing and rusty from October 2014 until January 7, 2015, the day after pipeline was shut down."

97.    On January 21, 2015, Defendants reported that the Blacktail Creek Discharge was only approximately 70,000 barrels of produced water, based on a comparison of the metering data gathered at each LACT unit within the Marmon Water Gathering System and the data gathered from the Rosemount Meters from December 25, 2014, through January 6, 2015.

98.    Available evidence, including metering data, aerial photographs, pipeline pressure, an examination of the failed section of pipeline, and Defendants' own internal analysis from January 10, 2015, indicates that the volume of the Blacktail Creek Discharge exceeded 700,000 barrels of produced water.

99.    The Blacktail Creek Discharge travelled overland from the rupture in the Marmon Pipeline to Blacktail Creek. At the location where the Blacktail Creek Discharge entered the Creek, the Creek is approximately 15 feet wide and 8 inches deep.

100.    The Blacktail Creek Discharge also travelled subsurface beneath approximately 60 acres, contaminating Class I groundwater of the State.

101.    Blacktail Creek is a tributary that flows for at least four to six months during the year and has a clearly defined bed and banks and an ordinary high water mark. From the Blacktail Creek Discharge site, Blacktail Creek flows downstream approximately 4.5 miles to the Little Muddy River, a perennial tributary, which flows approximately 28 miles downstream to the Missouri River.

102.    The Blacktail Creek Discharge had a visible impact, including oil sheens and staining, on Blacktail Creek and its sediments, shorelines, and vegetation as far downstream as the confluence with the Little Muddy River, and measureable impacts to the surface water quality approximately 33 miles downstream at the confluence between the Little Muddy River and the Missouri River.

103.    Large segments of Blacktail Creek were reported as stained or coated with oil or oil residue, and visible oil sheens continued to be present on the surface water months after the Blacktail Creek Discharge was reported.

104.    The Blacktail Creek Discharge caused numerous violations of State numeric water quality criteria over an extended period.

105.    Produced water and the specific compounds it contains are toxic to plants, fish, and aquatic biota and unsuitable for domestic, municipal, or agricultural use and harmful to humans.

106.   Evidence suggests that water contamination from produced water spills of this type is persistent in the environment, resulting in elevated levels of salts and trace elements that can remain in the environment for months to years following the original spill.

107.   Beginning in January 2015, NDDEQ, EPA, NDGF, and NDIC have taken multiple actions in response to the Blacktail Creek Discharge, including sampling, monitoring, assessment, and oversight of removal actions. Removal actions involved the use of oil containment boom, oil skimmers, vacuum trucks, and other heavy equipment. Six miles of road were constructed during the response to the Blacktail Creek Discharge.

108.   Significant amounts of crude oil were removed from Blacktail Creek as part of the remediation efforts taken in response to the Blacktail Creek Discharge.

109.   Oil removal activities were generally completed in May 2015, with monitoring conducted to assess for residual oil discharge to the surface water. Groundwater recovery operations continue under state oversight to recover high chloride, ammonia, and hydrocarbon-impacted groundwater within the alluvial aquifer near the creek.

110.   An estimated 2,700 acres or more in and around Blacktail Creek have been impacted by the Blacktail Creek Discharge or measures taken to clean up the Blacktail Creek Discharge. As a result, natural resources under the trusteeship of the United States and the State have been injured, destroyed, or lost due to discharged oil and associated response efforts, including aquatic, riparian, and upland habitats.

111.   In addition, the United States and the State have incurred costs associated with their assessment of natural resource injuries caused by the Blacktail Creek Discharge and the associated response actions, and will continue to incur such costs.

## CLAIM ONE: INJUNCTIVE RELIEF UNDER THE CWA

112.    Paragraphs 1-111 are realleged and incorporated by reference.

113.    Crude oil, produced water, chloride, sodium, ammonia, aluminum, arsenic, boron, copper, nickel, selenium, zinc, barium, benzene, and thallium each constitute "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

114.    The Marmon Pipeline is a "point source" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

115.    At all relevant times, Defendants did not have an NPDES permit to discharge from the Marmon Pipeline to Blacktail Creek.

116.    Blacktail Creek and the Little Muddy River are "navigable waters" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and the Blacktail Creek Discharge involved the "discharge of pollutants" within the meaning of Section 502(12) of the CWA, 33 U.S.C. § 1362(12).

117.    The Blacktail Creek Discharge was a discharge of pollutants in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

118.    The Marmon Pipeline was owned and/or operated by Defendants at the time of the Blacktail Creek Discharge and continues to be owned and/or operated by Defendants.

119.    Defendants are subject to appropriate injunctive relief pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), to prevent further discharges from their facilities into waters of the United States.

## CLAIM TWO: CIVIL PENALTIES UNDER THE CWA

120.    Paragraphs 1-119 are realleged and incorporated by reference.

121.   The Blacktail Creek Discharge constituted a "discharge" within the meaning of Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2).

122.   Crude oil and produced water each constitute "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1).

123.   The Blacktail Creek Discharge involved the discharge of oil to "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

124.   The Blacktail Creek Discharge involved the discharge of oil "in such quantities as may be harmful to the public health or welfare or the environment of the United States" within the meaning of Section 311(b)(3) and (b)(4) of the CWA, 33 U.S.C. § 1321(b)(3) & (b)(4), and 40 C.F.R. § 110.3(b).

125.   The Blacktail Creek Discharge was a "discharge of oil . . . into or upon navigable waters of the United States . . . in such quantities as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3). As such, the Blacktail Creek Discharge was in violation of Section 311(b)(3) of the CWA.

126.   The Marmon Water Gathering System and the Marmon Pipeline are each an "onshore facility" within the meaning of Sections 311(a)(10) and 311(b)(7) of the CWA, 33 U.S.C. §§ 1321(a)(10) and 1321(b)(7).

127.   Defendant Meadowlark Midstream Company, LLC was an "owner, operator, or person in charge" of the Marmon Water Gathering System and the Marmon Pipeline at the time of the Blacktail Creek Discharge within the meaning of Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7).

128.    Defendant Summit Midstream Partners, LLC was an "owner, operator, or person in charge" of the Marmon Water Gathering System and the Marmon Pipeline at the time of the Blacktail Creek Discharge within the meaning of Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7).

129.    As a result of Defendants' violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), Defendants are each liable under Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), for a civil penalty of up to $2,100 per barrel discharged, or, if it is established that the violation is the result of gross negligence or willful misconduct, Defendants are each liable under Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), for a penalty of up to $5,300 per barrel discharged.

## CLAIM THREE: NATURAL RESOURCE DAMAGES UNDER THE CWA

130.    Paragraphs 1-129 are realleged and incorporated by reference.

131.    At all relevant times, the Marmon Water Gathering System and the Marmon Pipeline were each an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10).

132.    Crude oil and produced water each constitute "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1).

133.    Produced water includes "hazardous substances" within the meaning of Section 311(a)(14) of the CWA, 33 U.S.C. § 1321(a)(14), including but not limited to ammonia and benzene. 40 C.F.R. § 116.4.

134.    The Blacktail Creek Discharge constituted a "discharge" within the meaning of Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2).

135.    Blacktail Creek is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

136.   The Blacktail Creek Discharge involved the discharge of oil and hazardous substances "in such quantities as may be harmful to the public health or welfare or the environment of the United States" within the meaning of Section 311(b)(3) and (b)(4) of the CWA, 33 U.S.C. § 1321(b)(3) & (b)(4), and 40 C.F.R. §§ 110.3(b), 116.4.

137.   The Blacktail Creek Discharge was a "discharge of oil or hazardous substances into or upon navigable waters of the United States . . . in such quantities as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3). As such, the Blacktail Creek Discharge was in violation of Section 311(b)(3) of the CWA.

138.   As a result of the discharge from the Marmon Water Gathering System, "natural resources" within the meaning of the CWA, 33 U.S.C. § 1321(f)(4), have been damaged or destroyed, or their use has been damaged or destroyed.

139.   Pursuant to Section 1321(f)(5) of the CWA, 33 U.S.C. § 1321(f)(5), and 40 C.F.R. § 300.600, DOI is trustee for certain natural resources located in the area impacted by the Blacktail Creek Discharge.

140.   Pursuant to Section 1321(f)(5) of the CWA, 33 U.S.C. § 1321(f)(5), and 40 C.F.R. § 300.605, NDDEQ and the NDGF are trustees for certain natural resources located in the area impacted by the Blacktail Creek Discharge.

141.   As a result of the discharge from the Marmon Water Gathering System, DOI, NDDEQ, and NDGF have sustained and/or will sustain costs or expenses in the restoration or replacement of natural resources damaged or destroyed by the Blacktail Creek Discharge within the meaning of the CWA, 33 U.S.C. § 1321(f)(4).

142.   Meadowlark Midstream Company, LLC is an "owner or operator" within the

27

meaning of Sections 311(a)(6) and 311(f) of the CWA, 33 U.S.C. §§ 1321(a)(6) and (f).

143.    Summit Midstream Partners, LLC is an "owner or operator" within the meaning of Sections 311(a)(6) and 311(f) of the CWA, 33 U.S.C. §§ 1321(a)(6) and (f).

144.    As owners or operators, Defendants are jointly and severally liable to the United States and the State pursuant to Section 311(f)(4) of the CWA, for all costs or expenses incurred in the restoration or replacement of natural resources damaged or destroyed by the Blacktail Creek Discharge.

### CLAIM FOUR: CIVIL PENALTIES UNDER N.D.C.C. CHAPTER 61-28

145.    Paragraphs 1-144 are realleged and incorporated by reference.

146.    In addition to surface water, the Blacktail Creek Discharge also travelled subsurface beneath approximately 60 acres, contaminating Class I groundwater of the State.

147.    Blacktail Creek, the Little Muddy Creek, the Missouri River, and the groundwater are all "waters of the state" within the meaning of N.D.C.C. § 61-28-02(15).

148.    Defendants are all "persons" within the meaning of N.D.C.C. § 61-28-02(5).

149.    The Blacktail Creek Discharge was a "discharge" within the meaning of N.D.C.C. § 61-28-02(3).

150.    The Marmon Pipeline is a "point source" within the meaning of N.D.C.C. § 61-28-02(6).

151.    The crude oil, produced water, chloride, sodium, ammonia, aluminum, arsenic, boron, copper, nickel, selenium, zinc, barium, benzene, and thallium are "wastes" under N.D.C.C. § 61-28-02(14) that caused "pollution," within the meaning of N.D.C.C. § 61-28-02(7).

**Unpermitted Discharge**

152.    Defendants did not have a NDPDES permit to discharge wastes into waters of the state and had not filed a completed permit application at the time of the discharge, as required by N.D.C.C. § 61-28-06(2)-(3) and N.D. Admin. Code § 33-16-01-02.

153.    Defendants' discharge into waters of the state without a NDPDES permit violated N.D.C.C. § 61-28-06(2)-(3) and N.D. Admin. Code § 33-16-01-02.

**Pollution and Degradation of Water Quality**

154.    Blacktail Creek is designated as a Class III stream. The Little Muddy Creek is designated as a Class II stream. Appendix I, N.D. Admin. Code ch. 33-16-02.1.

155.    The groundwater around and under Blacktail Creek is a Class I groundwater of the State.

156.    The Blacktail Creek Discharge caused Blacktail Creek's waters to violate the State's numeric standards for Class III streams in N.D. Admin. Code § 33-16-02.1-09.

157.    The Blacktail Creek Discharge caused Blacktail Creek's waters and groundwater to violate the State's narrative standards in N.D. Admin. Code § 33-16-02.1-08. Specifically, the Blacktail Creek Discharge caused floating oil and scum in amounts that were "unsightly or deleterious"; contaminants from the Blacktail Creek Discharge were in concentrations and combinations "toxic or harmful" to humans, animals, plants, and resident aquatic biota"; the Blacktail Creek Discharge caused a visible film or sheen upon Blacktail Creek and a sludge or emulsion along the adjoining shoreline; and the Blacktail Creek Discharge prevented the classified uses of Blacktail Creek and the groundwater. In addition, the Blacktail Creek Discharge caused an injury to environmental resources and impaired the beneficial uses of waters of the State.

158.   Defendants' discharge of wastes into Blacktail Creek and groundwater caused pollution of the State's waters and caused degradation of water quality below the State's numeric and narrative water quality standards in violation of N.D.C.C. § 61-28-06(1) and N.D. Admin. Code §§ 33-16-02.1-08, 33-16-02.1-09, and 33-16-02.1-11(2).

### Failure to Report

159.   Defendants did not report the Blacktail Creek Discharge to NDDEQ until January 7, 2015, months after the Blacktail Creek Discharge first occurred.

160.   The report submitted to NDDEQ significantly understated the volume and duration of the Blacktail Creek Discharge.

161.   Defendants failed to "immediately" report the Blacktail Creek Discharge and, when they eventually did report it, failed to "provide all relevant information" in violation of N.D. Admin. Code § 33-16-02.1-11(4).

### Penalties

162.   As a result of Defendants' violation of N.D.C.C. ch. 61-28 and the rules promulgated thereunder, Defendants are each liable under N.D.C.C. § 61-28-08(4) for a civil penalty up to $12,500 per day per violation.

### CLAIM FIVE: INJUNCTIVE RELIEF UNDER N.D.C.C. CHAPTER 61-28

163.   Paragraphs 1-162 are realleged and incorporated by reference.

164.   Violations of N.D.C.C. ch. 61-28 and the rules promulgated thereunder are likely to continue unless enjoined by an order of the Court.

165.   Defendants are subject to appropriate injunctive relief pursuant to N.D.C.C. § 61-28-08(5).

## CLAIM SIX: NATURAL RESOURCE DAMAGES UNDER
## N.D.C.C. CHAPTER 61-28

166.    Paragraphs 1-165 are realleged and incorporated by reference.

167.    Defendants' discharge of waste into Blacktail Creek and groundwater caused pollution to waters of the State and degradation of water quality in violation of N.D.C.C. § 61-28-06(1) and N.D. Admin. Code ch. 33-16-02.1.

168.    As a result of these violations, the State has sustained and/or will sustain "damages" within the meaning of N.D.C.C. § 61-28-04(24). The assessment of the impacts of the Blacktail Creek Discharge is ongoing, and the full extent of the damages is not yet known.

169.    Defendants are jointly and severally liable to the State for the damages caused by these violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State, respectfully request that this Court:

1.    Enter a judgment against Defendants and assess a civil penalty, under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 132(b)(7), and Section 61-28-08 of the North Dakota Century Code against each Defendant in an amount to be determined by the Court;

2.    Award injunctive relief against the Defendants as appropriate;

3.    Award damages under Section 311(f)(4) of the CWA, 33 U.S.C. § 1321(f)(4), and N.D.C.C. § 61-28-04(24) for all costs or expenses incurred in the restoration or replacement of natural resources damaged or destroyed by the Blacktail Creek Discharge, including Plaintiffs' reasonable costs of assessing such damages; and

4.    Grant such other relief as the Court may deem appropriate.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice


 */s/ Laura A. Thoms*
LAURA A. THOMS, Bar No. DC 488784
Senior Attorney
DEVON A. AHEARN, Bar No. CA 307275
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel:     202-305-0260 (L. Thoms); 202-514-2717 (D. Ahearn)
Email: laura.thoms@usdoj.gov; devon.ahearn@usdoj.gov

FOR THE STATE OF NORTH DAKOTA,
NORTH DAKOTA DEPARTMENT OF
ENVIRONMENTAL QUALITY AND
NORTH DAKOTA GAME AND FISH DEPARTMENT

WAYNE STENEHJEM
NORTH DAKOTA ATTORNEY GENERAL


MARGARET I. OLSON, State Bar ID No. 06352
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone: (701) 328-3640
Facsimile: (701) 328-4300
Email: maiolson@nd.gov