IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF NORTH DAKOTA, NORTH DAKOTA DEPARTMENT OF ENVIRONMENTAL QUALITY and NORTH DAKOTA GAME AND FISH DEPARTMENT,<br><br>Plaintiffs,<br><br>v.<br><br>SUMMIT MIDSTREAM PARTNERS, LLC and MEADOWLARK MIDSTREAM COMPANY, LLC,<br><br>Defendants | Civil Action No. 1:21-CV-00161-DMT-CRH |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
<u>UNOPPOSED MOTION TO ENTER CONSENT DECREE</u>**

This case involves a 700,000-barrel discharge of oil-contaminated produced water from Defendants' ruptured pipeline near Marmon, North Dakota, that polluted land, groundwater, and over 30 miles of tributaries of the Missouri River. On August 5, 2021, after multiple years of investigation and negotiation, the United States and the State filed a Complaint asserting civil environmental claims relating to the discharge (ECF No. 1), and simultaneously lodged with the Court a Consent Decree that would resolve those claims (ECF No. 3).[1] A thirty-day public comment period has now passed, during which no comments were received.

Under the proposed Decree, the Defendants, Summit Midstream Partners, LLC and Meadowlark Midstream Company, LLC, and a related operating entity, Summit Operating Services Company, LLC, will clean up the contamination caused by the spill at issue, implement

---

[1] On the same date, the United States separately filed a criminal information asserting charges for environmental crimes relating to the discharge, and a plea agreement that, if accepted by the Court, would resolve those charges. *United States v. Summit Midstream Partners, LLC*, 1:21-cr-00152-DMT, ECF Nos. 1, 4.

1

comprehensive injunctive relief designed to prevent future violations, and pay $1.25 million in natural resource damages. In addition, the Defendants will pay a total of $20 million in civil penalties. The Court should enter the Consent Decree because the settlement reached by the parties is fair, reasonable, and adequate. Based on the Motion and its supporting Memorandum, the Plaintiffs request that the Court approve and sign the Consent Decree lodged on August 5, 2021, and enter it as the final judgment in this action.

## I.     BACKGROUND

### A.     The Blacktail Creek Discharge and Associated Civil Claims

The discharge at issue originated from a pipe in the Marmon Water Gathering System – a pipeline system carrying produced water generated by a third-party oil producer from well pads to an underground injection site. Compl. ¶ 59, ECF No. 1. Defendants owned, constructed, and operated the Marmon Water Gathering System. *Id.* ¶¶ 60-62.

During Defendants' construction of the System, Defendants did not follow manufacturer recommendations for integrity testing. *Id.* ¶¶ 71-73. Even so, the testing resulted in multiple leaks and blowouts, indicating problems with installation. *Id.* ¶ 74. Defendants began accepting produced water into the System in June of 2014, without any leak detection system in place. *Id.* ¶¶ 75, 77-79. About two months later, on August 17, 2014, the pipeline ruptured. *Id.* ¶ 83. Despite multiple indications that a rupture had occurred, Defendants did not shut down the pipeline or report the spill until January 2015. *Id.* ¶¶ 83-90.

The ruptured pipe was located about 178 feet from Blacktail Creek, near Marmon, North Dakota, and discharged produced water over land and through groundwater into the Creek. *Id.* ¶¶ 57, 91-92, 94. Though Defendants initially reported the discharge quantity to be 70,000 barrels, multiple lines of evidence indicate the discharge exceeded ten times that amount. *Id.* ¶¶ 1, 97-98. The discharge contained numerous pollutants harmful to humans and toxic to plants,

2

fish, and aquatic biota, including crude oil, chloride, sodium, ammonia, aluminum, arsenic, boron, copper, nickel, selenium, zinc, barium, benzene, and thallium. *Id.* ¶ 93, 105. It contaminated area groundwater and approximately 33 miles of Blacktail Creek and the Little Muddy River, a tributary of the Missouri River. *Id.* ¶¶ 93, 95, 102. The discharge, and measures necessary to clean up the discharge, have impacted an estimated 2,700 acres in and around Blacktail Creek. *Id.* ¶ 110. As a result, natural resources under the trusteeship of the United States and the State have been injured, destroyed, or lost, including aquatic, riparian, and upland habitats. *Id.* ¶ 110.

Based on these allegations, the United States asserts claims under the Clean Water Act for injunctive relief (Compl. ¶¶ 112-119), civil penalties (*id.* ¶¶ 120-129), and natural resource damages (*id.* ¶¶ 130-144). The State asserts claims under N.D. Cent. Code chapter 61-28 for civil penalties (*id.* ¶¶ 145-162), injunctive relief (*id.* ¶¶ 163-165), and natural resource damages (*id.* ¶¶ 166-169), and joins in the federal Clean Water Act natural resource damages claim (*id.* ¶ 144).

**B.      Proposed Consent Decree**

The proposed Consent Decree imposes four categories of requirements, discussed in more detail below: compliance requirements, remediation measures, natural resource damages, and civil penalty.[2] The requirements apply to the Defendants identified in the Complaint as well as Summit Operating Services Company, LLC, which supplies employees and otherwise manages operations necessary to implement Consent Decree requirements. *See* Consent Decree ("CD") ¶ I.H, ECF No. 3-1. The Consent Decree will fully resolve the claims in the Complaint,

---

[2] Funding and implementation of the compliance and remediation measures under Sections IX, X, and XI of the Consent Decree are also a condition of probation in the proposed criminal plea agreement in the parallel criminal proceeding. *See United States v. Summit Midstream Partners, LLC*, 1:21-cr-00152-DMT, ECF No. 4 ¶ 11.d.iii.

3

as well as related claims for natural resource damages and remediation. CD ¶¶ 113-115; *see also id.* ¶ 8.aa (defining "natural resource damages").

### 1. *Compliance Requirements (CD Section X)*

The proposed Consent Decree requires Defendants to take multiple actions to prevent future violations across all of Defendants' North Dakota produced water pipeline facilities. Defendants must continue implementing these ongoing compliance measures for at least a three-year period. *See id.* ¶ 134.a. Measures include:

*Pipeline Installation, Operation, and Testing* (CD Section X.A). Defendants are required to meet certain installation standards and obtain a certification from a third-party inspector that new or altered pipelines have been inspected and pressure tested prior to commencing operation. *Id.* ¶¶ 31-34. For existing lines, Defendants must maintain specified limits on maximum operating pressure designed to preserve pipe integrity. *Id.* ¶ 35. These maximum operating pressure limitations will carry forward after the Consent Decree is terminated in a Consent Agreement that Defendants have simultaneously entered into with the North Dakota Industrial Commission ("NDIC").[3] *Id.* Section I ¶ G.

*Control Room and Computational Pipeline Monitoring System* (CD Section X.B). Defendants are required to implement and manage a centralized control room and computational pipeline monitoring system that remotely monitors pipelines for leaks. *Id.* ¶¶ 36-37. Defendants must hire a third-party auditor to audit the systems and related operational procedures for compliance with applicable guidelines. *Id.* ¶ 38.

*Line Visibility and Inspections* (CD Section X.C). Defendants are required to mark the location of the pipelines and conduct regular maintenance of rights of way to assist in visual

---

[3] The Consent Agreement resolves a 2015 NDIC administrative complaint relating to the discharge. *Id.*

4

inspections. *Id.* ¶ 39. Defendants must conduct aerial inspections of the pipelines no fewer than 26 times a year and on-the-ground inspections at least four times a year, as well as obtain Environmental Protection Agency ("EPA") and North Dakota Department of Environmental Quality ("NDDEQ") approval of inspection protocols and audit procedures. *Id.* ¶¶ 40-42.

*Spill Response Planning and Countermeasures* (CD Section X.D). Defendants must submit spill response plans, conduct tabletop response exercises every year, and conduct a full-scale response exercise every three years. *Id.* ¶¶ 43-44. Defendants must also conduct community outreach sessions. *Id.* ¶ 45. In the event of a spill, the Consent Decree identifies several measures that must be taken, including implementing the spill response plan and conducting a root cause analysis of the spill. *Id.* ¶¶ 46-47.

*Environmental Management System ("EMS")* (CD Section X.E). Using a third-party consultant, Defendants must revise their EMS to meet specified criteria. *Id.* ¶¶ 50-52. Within 12 months after implementing the revised EMS, Defendants must use a second third-party consultant to audit the adequacy of its EMS implementation. *Id.* ¶ 53. These provisions are designed to ensure an overhaul of organizational structure, reporting, and processes to instill environmental compliance as a core principle and ensure prioritization of environmental compliance measures.

*Data Management and Training* (CD Sections X.F and X.G). Defendants must conduct regular training, and create and maintain a centralized database to track information relating to that training, as well as pipeline conditions and operation. *Id.* ¶¶ 55-59.

    2.    <u>Remediation Measures</u>

In addition to compliance measures, the Consent Decree requires Defendants to complete remediation of groundwater and surface water, as well as conduct site reclamation and

restoration. CD ¶ 69. Remediation work will continue until specified groundwater and surface water chloride levels are achieved and the site has been remediated to a condition that is supportive of existing and historical receptors and uses. *Id.* ¶¶ 70-71.

        3.    <u>*Natural Resource Damages*</u>

The Consent Decree requires Defendants to pay $1 million to fund restoration projects under the Restoration Plan developed by the state and federal trustees for the natural resources at issue. CD ¶¶ 22-23. Defendants must also pay a total of $250,000 in assessment costs to reimburse the trustees for past and estimated future costs incurred in assessing the extent of damages and planning for restoration. *Id.* ¶¶ 20-21. The Decree includes a special reservation of rights that allows the trustees to pursue recovery of additional natural resource damages in the event that new information reveals loss of a type unknown or a greater magnitude than was known by the trustees as of the lodging of the Decree. CD ¶ 121.

        4.    <u>*Civil Penalty*</u>

The Consent Decree requires payment of a total of $20 million in civil penalty, plus 3.25% interest. CD ¶¶ 10, 8(u). The penalty amount is split equally between the United States and the State, with some of the State portion going to NDIC to resolve related administrative claims. *Id.* ¶ 10. Because of limitations on Defendants' ability to pay, penalty payments are to be made over a six-year period. *Id.* ¶ 11; Section I ¶ I. The Consent Decree also allows for the NDDEQ portion of the State's penalty to be mitigated by one or more State SEPs if Defendants submit and implement an appropriate proposal within a certain time frame after the CD is entered. *Id.* ¶ 15.

**C.**    **Public Comment Period**

Pursuant to 28 C.F.R. § 50.7 and Paragraph 139 of the Consent Decree, the United States held a public notice and comment period on the Decree, commenced by publishing notice of the

Decree in the Federal Register on August 11, 2021. *See* 86 Fed. Reg. 44,056. The federal comment period ended with no comments received.

## II.   STANDARD OF REVIEW

The court reviews a proposed consent decree for "fairness, reasonableness, and adequacy." *United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir. 1992); *see also United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992). "Fairness" includes the fairness of the negotiation process as well as the fairness of the substantive result. *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). "Reasonableness" and "adequacy" include factors such as the degree to which the remedy will adequately address the harm, whether the relief will bring the defendant into compliance and prevent future violations, and whether the settlement is consistent with statutory purposes and public interest. *See, e.g.*, *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436-37 (6th Cir. 1991); *United States v. Lexington-Fayette Urb. Cnty Gov't*, 591 F.3d 484, 489 (6th Cir. 2010).

A number of overarching principles apply to the determination of whether a consent decree is fair, reasonable, and adequate. First, the court "should be guided by the general principle that settlements are encouraged." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); *see also*, *Cannons Eng'g Corp.*, 899 F.2d at 84 (1st Cir. 1990). This presumption in favor of settlement is particularly strong where a consent decree has been negotiated "on behalf of a federal administrative agency… which enjoys substantial expertise in the environmental field." *Akzo Coatings*, 949 F.2d at 1436. Under these circumstances, the court should defer to "the EPA's inherent experience and expertise in handling such matters" when reviewing a consent decree. *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir.

2002); *see also Cannons Eng'g*, 899 F.2d at 84 (the district court "must refrain from second-guessing the Executive Branch").

Second, the consent decree must be reviewed in light of what it is – a settlement of claims and not a disposition after trial on the merits. *See, e.g., Metro. St. Louis Sewer Dist.*, 952 F.2d at 1040 ("A consent decree is not reviewed as a judgment on the merits"); *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (a consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise"). Thus, a decree may take into account "reasonable discounts for litigation risks, time savings, and the like that may be justified." *United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001).

Finally, "while the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983) (a court is not "empowered to rewrite the settlement agreed upon by the parties," or to "delete, modify, or substitute certain provisions of the consent decree."). In reviewing the consent decree, the standard is not whether the decree is "one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *Cannons Eng'g*, 899 F.2d at 84.

### III.   DISCUSSION

#### A.   The Settlement Process Was Fair and Well Informed.

The fairness of the settlement process is measured by its candor, openness, and bargaining balance. *Cannons Eng'g Corp.*, 899 F.2d at 86. Here, the parties spent five years in

arms-length negotiations, exchanging countless drafts, phone calls, and emails, and holding multiple in-person and online meetings. All parties were represented by experienced counsel, and discussions were informed by Defendants' responses to EPA information requests, site visits, and input from agency technical staff and third-party experts. There is no question that the Consent Decree is procedurally fair. *See BP Amoco Oil*, 277 F.3d at 1019–20 (respect for agency's role is heightened where "the cards are dealt face up" and parties with conflicting interests "hammer out an agreement at arm's length" (citing *Cannons Eng'g Corp.*, 899 F.2d at 84)).

> **B.  The Consent Decree is Substantively Fair and Reasonable Because It Holds Defendants Accountable And Requires Measures To Prevent Future Violations.**

The proposed Consent Decree is substantively fair, reasonable, and adequate. The Decree holds Defendants accountable for their violations by requiring Defendants to clean up the spill, pay for natural resource restoration, take measures to prevent future spills, and pay a substantial civil penalty. *See BP Amoco Oil*, 277 F.3d at 1020 (substantive fairness considers the "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible" (quoting *Cannons Eng'g Corp.*, 899 F.2d at 87)). Spill remediation measures will continue until the Site meets specified standards protective of state water quality, and Defendants will fund projects necessary to fully restore natural resources damaged by the spill. *See Akzo Coatings*, 949 F.2d at 1437 (most important factor in determining reasonableness of decree is degree to which the remedy will adequately address the harm). Further, the Decree requires Defendants to take concrete steps to prevent future discharges and instill a corporate culture of environmental compliance, including an environmental management system; data management and training measures; stringent pipeline installation, operation, and testing requirements; a centralized computational pipeline monitoring system; and spill response

planning and countermeasures. Additional accountability will be provided through state and federal oversight of Defendants' compliance with the Decree, as well as independent third-party inspections and audits of certain compliance measures. *See United States v. Lexington-Fayette Urb. Cnty Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (finding consent decree reasonable where it will bring defendant into compliance with Clean Water Act and prevent future violations).

### C. The Consent Decree is Reasonable and Adequate Because it Serves the Public Interest.

Finally, the proposed Decree is consistent with statutory purposes and serves the public interest. The requirements are designed to prevent illegal discharges of pollutants from Defendants' pipeline facilities and restore natural resources, a result which is wholly consistent with the Clean Water Act and North Dakota law. *See* 33 U.S.C. § 1251(a) (the objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."); N.D. Cent. Code § 61-28-01 (declaring a policy to "to act in the public interest to protect, maintain, and improve the quality of the waters in the state…"). Moreover, entry of the Decree would ensure that the environmental benefits from these measures reach the citizens of North Dakota much more quickly, and without the substantial expenditure of taxpayer and judicial resources that would be necessitated by litigation. *Bragg v. Robertson*, 83 F. Supp. 2d 713, 717 (S.D. W. Va. 2000) ("It is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees. Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation."); *United States, et al. v. BP Prods. N. Am., Inc.*, No. 2:12-CV-207, 2012 WL 5411713, at *3-4 (N.D. Ind. Nov. 6, 2012) (consent decree "serves the public interest by providing these environmental benefits more quickly and at less cost than could be achieved through litigation . . . a risky proposition with uncertain results.").

## IV.   CONCLUSION

As described above, the Consent Decree imposes appropriately robust requirements and civil penalties on the entities responsible for a massive spill that has had significant and long-lasting impacts on North Dakota lands and waters. The Consent Decree terms – reached after lengthy and hard-fought negotiations – are fair, adequate, and reasonable and in the public interest. For these reasons, the Court should grant the Plaintiffs' Unopposed Motion to Enter Consent Decree and sign and enter the proposed Consent Decree as a final judgment.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*/s/ Laura A. Thoms*
LAURA A. THOMS, Bar No. DC 488784
Senior Attorney
DEVON A. AHEARN, Bar No. CA 307275
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel:    202-305-0260 (L. Thoms); 202-514-2717 (D. Ahearn)
Email: laura.thoms@usdoj.gov; devon.ahearn@usdoj.gov

FOR THE STATE OF NORTH DAKOTA, NORTH DAKOTA
DEPARTMENT OF ENVIRONMENTAL QUALITY AND
NORTH DAKOTA GAME AND FISH DEPARTMENT

WAYNE STENEHJEM
NORTH DAKOTA ATTORNEY GENERAL

*/s/ Margaret I. Olson*
MARGARET I. OLSON, State Bar ID No. 06352
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone: (701) 328-3640
Facsimile: (701) 328-4300
Email: maiolson@nd.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and sent copies by electronic mail and through the United States Postal Service to the following:

Margaret I. Olson
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
(701) 328-3640
maiolson@nd.gov
*Counsel for North Dakota*

Rachel Jacobson
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
(202) 663-6385
rachel.jacobson@wilmerhale.com
*Counsel for Defendants*

                                                */s/ Laura A. Thoms*
                                                Senior Attorney
                                                United States Department of Justice